| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>SOUTHERN DISTRICT OF NEW YORK<br>POUGHKEEPSIE DIVISION | **For Publication** |

-----------------------------------------------------------x

In re:                                                    Chapter 11
                                                          Case No. 05-36501(CGM)
      MARK LEVON HELM and
      SANDRA DODD HELM,

                       Debtors.

-----------------------------------------------------------x

**A P P E A R A N C E S:**

Michael D. Pinsky, P.C.
Attorney for Debtors
30 Matthews Street
Suite 304
Goshen, New York  10924

Schuyler G. Carroll, Esq.
Arent Fox PLLC
Attorneys for Royalty Recovery, Inc.
1675 Broadway
New York, New York  10019

John I. O'Neill, Esq.
Bleakley, Platt & Schmidt, LLP
Attorneys for Levon Helm Studios, Inc.
One North Lexington Avenue
White Plains, New York  10601

**MEMORANDUM OPINION GRANTING DEBTORS' MOTION REJECTING
EXECUTORY CONTRACT WITH ROYALTY RECOVERY, INC.**

**CECELIA G. MORRIS, U. S. B. J.:**

       This matter comes before the Court on Debtor's "Motion for Entry of an Order Pursuant to Section 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6006 and 9014 Rejecting Executory Contract with Royalty Recovery, Inc.", ECF Docket No. 30 (the "Motion to Reject").  For the reasons set forth below, the Court finds that the

agreement between Debtor Mark Levon Helm (the "Debtor") and Royalty Recovery, Inc. ("Royalty") is an executory contract within the meaning of 11 U.S.C. § 365 and is therefore subject to assumption or rejection. The Court further finds that Debtor may reject the contract with Royalty in his sound business judgment, and therefore grants Debtor's Motion to Reject in its entirety.

## JURISDICTION

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. § 157(a) and the Standing Order of Reference signed by Acting Chief Judge Robert J. Ward dated July 10, 1984. Motions to assume or reject executory contracts are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(A) and (O), as "matters concerning the administration of the estate" and "other proceedings affecting the liquidation of the assets of the estate..."

## BACKGROUND FACTS

The instant bankruptcy case was filed under Chapter 7 of the Bankruptcy Code on June 1, 2005. On August 8, 2005 the case was converted to a Chapter 11 case on Debtors' motion. According to the Schedule I filed with the Chapter 7 petition, Debtor Mark Levon Helm is an actor and musician, and his wife Sandra Dodd Helm is a homemaker.[1]

In October 2004, Debtor Mark Helm, and third parties Norman Clancy and Barbara O'Brien, formed Levon Helm Studios to record and take advantage of certain "Midnight Ramble Sessions," small, invited, live-recording group

---

[1] Although Sandra Dodd Helm is a co-debtor in this Chapter 11 case, the executory contract at issue concerns the collection and payment of Mr. Helm's royalties, and thus, all further references to a "debtor" are to Mr. Helm.

2

concerts at a recording studio owned by Debtor, located in Woodstock, New York.   In furtherance of this objective, Levon Helm Studios invested $100,000 to purchase recording and sound equipment and $30,000 to address maintenance issues on the premises.  The Midnight Rambles take place biweekly, with an audience limited to 90 persons, at a cost of $100 per ticket.  These sessions are also broadcast through a pay-per-view web cast.  Two CDs containing the Midnight Rambles have been released, together with other related merchandise (T-shirts etc) and Levon Helm Studios is about to enter into a distribution agreement to market current and future releases through retail outlets nationwide.  The Midnight Rambles may be subject to the terms of the Agreement (as defined below), and are therefore relevant to this decision.

According to its submissions, Royalty Recovery Inc. works with artists, writers, producers and other entities in the entertainment industry to ensure that performers' financial rights are protected and that they receive all of the compensation that is due them.  Debtor entered into a contract with Royalty on September 21, 2004 (the "Agreement"). The Agreement governs the relationship of the parties with respect to Royalty's retention as exclusive collection agent for Debtor Mark Levon Helm's performance and publishing royalties.  The Agreement provides that it is to be interpreted in accordance with New York law.[2]  To say that the Agreement is rife with spelling and typographical errors is an understatement (*see e.g.* foot notes 3-7); the Agreement also contains ambiguous provisions, such as the following:  "Helm hereby irrevocably appoints Royalty Recovery as Helms' (sic) attorney-in-fact for all mater (sic) relating to

---

[2] *See* Agreement, ¶ 10: "…This Agreement is to be governed by New York State Law…"

3

this agreement and in Helms' (sic) name and to execute and deliver any documents and/or otherwise that Royalty Recovery may deem necessary." *See* Agreement, ¶ 3. The Court is not quite sure what this provision entitles Royalty to do "in Helms' (sic) name" or what Royalty may do if it "otherwise…deem[s] necessary." Issues of coherency aside, however, it is Debtor's counsel's argument in the Motion to Reject that the Agreement is detrimental to the Debtor and an economic burden on the bankruptcy estate. The Agreement contains the following allegedly onerous provisions:

> Royalty is Debtor's collection agent for all royalties, past, present and future;[3]
>
> Royalty's appointment as collection agent is exclusive[4] and irrevocable;[5]
>
> The territory is the universe;[6]
>
> The term is perpetual;[7]
>
> Royalty is entitled to 40% of the Debtor's recovered royalty payments if litigation is not required and 50% if litigation is required.[8]

---

[3] See Agreement, ¶ 1: "Helm warrants, represents, covenants and agrees that Helm is entitled to a certain royalties (sic) from his performance, composition and sound recordings, which Helm is not currently receiving (collectively, the "Claims")…" and ¶ 4: "Helm hereby grants to Royalty Recovery the sole and exclusive rights in perpetuity: (a) the right to collect any and all royalties, fees, expenses and other income currently due or becoming due, except for all royalties, fees, expenses or other income which are currently being paid to Helm…"

[4] See Agreement, ¶ 2: "Helm hereby appoints, in perpetuity, Royalty Recovery as Helms' (sic) sole authorized representative with respect to all rights in and to the Claims."

[5] See Agreement, ¶ 3: "Helm hereby authorizes Royalty Recovery to proceed, as Helms' (sic) exclusive agent…Helm hereby irrevocably appoints Royalty Recovery as Helm (sic) attorney-in-fact for all mater (sic) relating to this agreement and in Helms' name and to execute and deliver any documents and/or otherwise that Royalty Recovery may deem necessary."

[6] See Agreement, ¶ 5: "The territory for this agreement shall be the universe."

[7] See Agreement, ¶ 2: "Helm hereby appoints, in perpetuity, Royalty Recovery as Helms' (sic) sole authorized representative…" and ¶ 4: "Helm hereby grants Royalty Recovery the sole and exclusive rights in perpetuity…"

[8] See Agreement, ¶ 6: "For any matters that are settled prior to commencing a lawsuit or other official proceeding, Royalty Recovery will take a fee of forty percent (40%) of the results and proceeds achieved as a direct or proximate result of Royalty Recovery's representation of Helms. For matters where litigation (or other official proceeding) is commenced, Royalty Recovery will take a fee of fifty percent (50%) of the results and proceeds achieved as a direct or proximate result of Royalty Recovery's representation."

4

Royalty has responded to the Motion to Reject by arguing that the contract is no longer executory, as Debtor no longer owes any performance pursuant to the Agreement and merely awaits payment from Royalty. In this regard, Royalty relies on a line of cases which hold that a contract is no longer executory where the only performance due is to execute certain documents and to receive the payment of money, citing to *In re Walbran*, 2000 WL 22668035, at *4 (Bankr. N.D. Ill. 2000). It is Royalty's argument that Debtor cannot now, after Royalty has rendered its performance, refuse to pay for services that Royalty has fully performed. Alternatively, if the Court ultimately determines that the Agreement is executory, Royalty argues that it should be entitled to an administrative expense claim against the estate pursuant to 11 U.S.C. § 503 for all monies that Debtor "receives" post petition in connection with Royalty's performance under the contract.

Debtor filed a "Reply to Royalty Recovery's Opposition," ECF Docket No. 43, positing that contingent fee contracts such as the Agreement with Royalty are by nature executory and therefore subject to rejection in the exercise of a debtor's business judgment. Debtor also argues for the first time in the Reply that the Agreement was automatically rejected when the Chapter 7 case was converted to a Chapter 11 case sixty days after the petition was filed; *see* 11 U.S.C. § 365(d)(1).[9] It is also Debtor's position that the Agreement is executory, with significant performance due on both sides. In support of this position, the Debtor points out that Royalty has not collected any money pursuant to the Agreement, and has therefore not earned any right to a commission. It is Debtor's opinion that Royalty's failure to collect any royalties is dispositive of the

---

[9] 11 U.S.C. § 365(d)(1) provides "[I]n a case under Chapter 7 of this title, if the trustee does not assume or reject an executory contract or unexpired lease of residential real property of the debtor within 60 days after the order for relief…then such contract or lease is deemed rejected." Debtor filed the instant case as a Chapter 7 on June 1, 2005; the case was converted upon Debtor's motion on August 8, 2005.

5

executory nature of the contract – that is, no performance had been rendered, much less completed. Additionally, Debtor maintains that his assistance is essential to Royalty's performance under the Agreement, as Royalty would be unable to identify the sources of all royalties, calculate royalties previously received, and obtain accountings to assess royalty rights that remain unpaid or which have been only partially paid, and then act to collect royalties still due, without the benefit of Debtor's institutional memory. Debtor's argument is that his assistance constitutes performance under the Agreement. In support of this argument, the Debtors have annexed a work compendium to the Reply, which sets forth the accomplishments of Debtor Mark Levon Helm's forty-five year career, as an indication of the extent and breadth of those accomplishments, and the necessity for his assistance in enforcing his rights thereto.

The Court heard oral argument on the Motion to Reject on November 29, 2005. At that time, the parties stipulated that it was their desire that the Court would decide the disputed issues on written submissions. The parties filed supplemental papers on December 20, 2005.

In his "Sur-Reply," ECF Docket No. 47, Debtor argues that, even if the only performance due on both sides is the obligation to pay, the contract is still executory "under any theory," that is, pursuant to the various tests formulated by courts to define whether a contract is "executory." Debtor Mark Levon Helm has submitted an affidavit reiterating that his assistance is crucial to the recovery of any royalties under the Agreement, as many of the royalty streams arise from recordings where no contracts exist, and his involvement is needed to identify the various interested parties and their roles before the participants' rights can be determined. Also filed with the Sur-Reply is

6

the affidavit of Norman Clancy, in which he states that in his capacity as president of Levon Helm Studios, Inc., he has acted as intermediary between Debtor and Royalty. In that role Mr. Clancy states that he has helped to identify certain claims to Royalty; however, some claims, which ostensibly would fall under the terms of the Agreement, have not been disclosed to Royalty. In that regard, to assist Royalty with its performance under the Agreement, Mr. Clancy, as Debtor's agent, would need to: identify such claims, provide information as to the various parties and their roles, ascertain and report whether compensation was agreed upon by Debtor, and discover whether releases had been obtained and what the scope of said releases might be. Both Debtor and Mr. Clancy state that Royalty has failed to acquire any past-due royalties within the scope of the Agreement since its execution, the collection of which would create a right to payment for Royalty.

Levon Helm Studios has filed a "Memorandum of Law in Support of the Motion to Reject," ECF Docket No. 46, alleging that Royalty has conceded in its Opposition that performance remains due from Royalty pursuant to the Agreement, and arguing that substantial performance remains due from Royalty and Debtor. Levon Helm Studios reiterates the argument that the contract was rejected by operation of law in the Chapter 7 prior to conversion; as well as arguing that regardless of any automatic rejection, a proper basis to reject the contract exists under the "business judgment" test (assuming the contract is executory, of course), and because Royalty has failed to collect any royalties in the fifteen months since the parties entered into the Agreement, rejection of the Agreement makes good business sense.

Jeffrey B. Gandel, who identifies himself as Royalty's owner, filed an Affidavit on behalf of Royalty, see ECF Docket No. 49. Mr. Gandel sets forth the efforts taken by Royalty on Debtor's behalf, and states that performance under the agreement has been fully completed, other than simple, ministerial matters. Mr. Gandel also seems to be arguing that the efforts set forth in his Affidavit comprise an exhaustive list of the matters allocated to Royalty under the Agreement, representing the major copyright and royalty issues surrounding Debtor. It is his argument[10] therefore that the Agreement has been fully performed by both parties, because Royalty has addressed all outstanding contract and royalty issues, and that Debtor seeks to reject the Agreement solely to avoid paying Royalty amounts that are owed to it. It is Royalty's stance that rejection of this contract would not accomplish the goal of § 365, i.e. to relieve debtor of performance under a burdensome contract, because mere payment is not considered, at least by some courts, to constitute sufficient performance due to render an agreement executory. Mr. Gandel also maintains that the Agreement was not automatically rejected during the Chapter 7 proceeding, citing to 11 U.S.C. § 348(c).

## DISCUSSION

**<u>Standard for Rejection of an Executory Contract Pursuant to 11 U.S.C. § 365</u>**

A debtor is permitted, with bankruptcy court permission, to assume or reject an executory contract in compliance with § 365 of the Bankruptcy Code. The Bankruptcy Code does not provide bankruptcy courts with guidance as to what constitutes an executory contract; the most widely accepted definition of an executory contract was first

---

[10] Mr. Gandel has cited case law and made legal arguments in his Affidavit. It is not clear whether Mr. Gandel is an attorney, although the fact that his Affidavit was notarized by counsel for Royalty would appear to indicate that he is not a lawyer admitted to practice in New York State.

8

enunciated by Professor Vern Countryman in *Executory Contracts in Bankruptcy: Part I*, 57 Minn. L. Rev. 439, 460 (1973), and is frequently cited as the controlling test in the context of assumption or rejection of contracts pursuant to 11 U.S.C. § 365. "Most courts have adopted the definition proposed by Professor Vern Countryman, describing an executory contract as one that is not so fully performed that a breach by either side would constitute a material breach of the contract." *See Penn Traffic Co. v. COR Route 5 Co., LLC (In re Penn Traffic Co.)*, 2005 WL 2276879 at * 2 (S.D.N.Y. Sept. 16, 2005); *see also Shoppers World Community Center v. Bradlees Stores, Inc. (In re Bradlees Stores, Inc.)*, 2001 WL 1112308 at *6 (S.D.N.Y. Sept. 20, 2001); *In re Teligent, Inc.*, 268 B.R. 723, 730 (Bankr. S.D.N.Y. 2001). In addition to the Countryman definition, courts have articulated the "some performance due" test,[11] as well as the "functional approach"[12] to executoriness. *See generally In re Riodizio*, 204 B.R. 417 (Bankr. S.D.N.Y. 1997). The Countryman definition is generally accepted as the most stringent test, *see Teligent, supra,* at 732, and thus, if a contract is executory under that standard, the contract is necessarily executory under the other two approaches. *Id.* It bears noting that both Debtor and Royalty have proceeded with the tacit understanding that the Countryman definition applied herein, as well. *See* Opposition of Royalty Recovery, at ¶ 17; Debtor's Reply, at ¶ 6 ("The issue confronting the Court on this motion is whether RRI has rendered substantial performance of the contract."). Therefore, the Court considers whether the Agreement is executory within the meaning of the Countryman definition.

---

[11] The some performance due test is spawned from the legislative history to 11 U.S.C. § 365, which indicates that the definition of an executory contract includes those on which performance is due to some extent on both sides. *See Riodizo, supra*, at 421.

[12] "Under the functional approach, the question of whether a contract is executory is determined by the benefits of assumption or rejection would produce for the estate." *Riodizo, supra,* at 422.

9

In applying the Countryman test, the Court must ascertain whether both Royalty and Debtor owe performance pursuant to the Agreement, and determine whether the failure to perform same would constitute a material breach.  The question of whether a breach of contract is material is a factual issue to be determined under state law. Pursuant to New York law, which governs this contract, "a material breach is a breach that goes to the root of the agreement between the parties, and is so substantial that it defeats that object of the parties in making the contract."  *See Wechsler v. Hunt Health Sys., Ltd.*, 330 F.Supp.2d 383, 414 (S.D.N.Y. 2004) (citation omitted), *see also Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 895 (2d Cir.1976); *Katz v. Berisford Int'l PLC, No*. 96 Civ. 8695, 2000 WL 959721, at *3 (S.D.N.Y. July 10, 2000); *Lanvin Inc. v. Colonia, Inc.*, 739 F.Supp. 182, 195 (S.D.N.Y.1990).  Debtor maintains that the Agreement remains largely unperformed; Royalty would have the Court believe that no further action need be taken by either party save to collect money – Royalty from Debtor, Debtor from infringing parties, who Royalty maintains will pay Debtor directly.

In this regard, the Court notes the inapplicability of that line of cases, beginning with *Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043 (4th Cir. 1985), which indicate that a contract is not executory if the only remaining performance due under the contract is the payment of money.  In the *In re Teligent* case, *supra,* Judge Bernstein correctly pointed out that this clarification of the nature of executory contracts applies only where all parties have *fully* performed under the contract and the only remaining obligation, on both sides, is the payment of money.  *See Teligent, supra,* at 732.  The example provided in *Teligent* is useful – where one party has fully performed, and awaits only payment by the other party, as in the instance of accounts payable and

accounts receivable, an agreement is not executory, as performance is complete, with only payment owed. *Id.* This example does not match the situation at bar. For instance, in several places in his Affidavit, Mr. Gandel states that payment is to be made, or is being made, "directly" (although it is not clear whether payment is being made to Debtor or to Royalty as conduit) as a result of Royalty's collection efforts.[13] The only party entitled to enforce Debtor's rights to these payments, pursuant to the terms of the Agreement, is Royalty, as Debtor's exclusive agent for collection of this kind. Thus, absent rejection of this Agreement, Royalty is not simply awaiting payment for making these arrangements, but rather, is also to ensure future adherence to these arrangements. *See* ¶ 4(a) of the Agreement, which states "Helm hereby grants to Royalty Recovery the sole and exclusive rights in perpetuity: a) to collect any and all royalties, fees, expenses or other income currently due or becoming due…"

The Court thinks that Royalty's characterization of the Agreement as "fully performed" ignores the plain language of the contract at issue. As discussed, the Agreement is perpetual in term; its jurisdiction is the universe (in the event that Debtor's work is being used at the space station and beyond); and it grants Royalty the exclusive right to collect Debtor's royalties "currently due or becoming due." Although Mr. Gandel's Affidavit argues that the reach of the Agreement is limited to certain existing

---

[13] *See* Gandel Affidavit:
¶ 5(c), in which Royalty maintains that they are now directly collecting money worldwide that is owed to Debtor for his public performances;
¶ 5(d), in which Royalty alleges that all foreign "societies" will "pay directly" for the use of Debtor's composition, "Ain't No More Cane";
¶ 5(h), in which Royalty maintains that money is being directly collected from the AFM & AFTRA Intellectual Property Rights Distribution Fund;
¶ 5(j), in which Royalty admits that it is negotiating a settlement with Sony regarding Debtor's albums with Bob Dylan;
¶ 5(j) and (l), in which Royalty states that the only remaining obstacle to payment from Capitol records is to sign agreements and collect royalties/pay Debtor directly; and
¶ 5(m), concerning various of Debtor's compositions, in which indicates that Royalty will issue standard form licenses and collect royalties.

11

infringements, a straightforward reading of the Agreement indicates that future infringements fall within its provisions, with an exception carved out only for those payments being received by Debtor at the time of execution of the Agreement. The object of the instant Agreement is to collect royalties due to the Debtor, and Royalty's failure to seek redress for future infringements or to seek collection on existing payment arrangements would defeat the object of the contract, and certainly constitute a material breach which would result in Debtor's relief from performance under the contract, that is, payment of Royalty's commission. *See Wechsler, supra,* at 414 ("When one party commits a material breach, the other party is relieved, or excused, from its further performance obligations."). Royalty's failure to collect royalties coming due in the future would constitute a material breach of the contract. Royalty has also failed to direct this Court's attention to a single case that indicates that a contract, perpetual in term, exclusive in nature and universal in territory, is no longer executory, so long as performance under the contract may become due in the future. In this case, for instance, the future unauthorized use of Debtor's work is not only possible, but likely, given the popularity of his existing music, and the likelihood that future compositions will be subject to the threat of infringement, i.e., the Midnight Rambles.

   The Court now turns to the argument that the Agreement is not executory as to Debtor. According to Royalty, Mr. Helm need only "sit back and collect checks," as the Agreement requires no further performance from Mr. Helm. The Agreement made Royalty Mr. Helm's perpetual, exclusive, universal collection agent, as well as his attorney-in-fact. Nevertheless, and creating somewhat of a contradiction, the Agreement also provides at paragraph 9: "Helm agrees to execute and supply to Royalty Recovery

12

any documents that Royalty Recovery may require to acquire and/or perfect the Claims." This paragraph begs the question, if the Agreement granted Royalty a perpetual, irrevocable power of attorney[14] to collect royalties on Debtor's behalf, why would Royalty require Mr. Helm's cooperation in executing documents necessary to acquire claims? The Court thinks it is likely that this provision was intended to ensure Debtor's cooperation with Royalty's collection efforts. The Court finds that Mr. Helm's cooperation in identifying existing and potential infringements was necessary to enable Royalty to perform under the Agreement – obviously; for if Royalty was unaware of the arrangement between Mr. Helm and the putative infringer, Royalty could not know if the use of Debtor's work was improper or not. Royalty would certainly be excused from seeking to collect from a party in the absence of a reasonable certainty as to the status of their use of the Debtor's work. Thus, it appears that Mr. Helm's refusal, failure, etc., to supply documents, or information, to Royalty, with regard to the arrangements made with third party users of his work, would constitute a material breach of the Agreement; such a failure would go to the heart of the Agreement, defeat its very purpose, and justify Royalty's non-performance. Therefore, Mr. Helm's performance is also perpetual in nature; that is, he is continuously obligated, under the Agreement, to supply Royalty with documents pertaining to royalties "becoming due."

"The key to deciphering the meaning of the executory contract rejection provisions, is to work backward, proceeding from an examination of the purposes rejection is expected to accomplish. If those objectives have already been accomplished,

---

[14] An attorney-in-fact is defined in Black's Law Dictionary as a synonym for attorney: "Strictly, one who is designated to transact business for another; a legal agent." Power of attorney is defined as "An instrument granting someone authority to act as agent or attorney-in-fact for the grantor." *See* BLACK'S LAW DICTIONARY 139, 1209 (8th ed. 2004).

13

or if they can't be accomplished through rejection, then the contract is not executory…" *See Wechsler, supra*, at 430 (citing *Riodizio, supra,* at 421-22). Debtor's stated purpose in seeking rejection of the contract is to increase the benefit to the estate by decreasing the cost of royalty collections in the future. This cannot be done absent rejection; the Agreement provides that Royalty has the exclusive right to collect royalties on Debtor's behalf in perpetuity. Although Royalty maintains that Debtor is merely attempting to avoid payment for collections already accomplished, 11 U.S.C. §365(g) provides that Royalty is entitled to rejection damages. Royalty would also have the right to file a proof of claim for any commissions earned for royalties actually collected pursuant to the Agreement. Royalty's asserted right to payment as an administrative claimant is discussed below.

**Administrative Expense Status**

In its Opposition to the Debtor's Motion to Reject, Royalty indicated that it sought allowance of an administrative expense claim pursuant to 11 U.S.C. § 503 for all monies the Debtor **receives** post-petition in connection with Royalty's performance under the Contract. "The party asserting the status of an administrative claimant has the burden of proof. He must demonstrate that (1) his claim arose from a transaction with or on account of consideration furnished to the debtor-in-possession, and (2) the transaction or consideration directly benefited the debtor-in-possession…Consideration exists generally where (1) the debtor-in-possession induces the creditor to perform post petition, or (2) **the creditor performs under an executory contract prior to rejection**." *See In re Patient Educ. Media, Inc.*, 221 B.R. 97, 101 (Bankr. S.D.N.Y. 1998). It is not clear on the current record that Royalty provided consideration that directly benefited the debtor-

14

in-possession, that is, by performing under the executory contract post-petition but prior to rejection. Thus the Court cannot grant Royalty's request for an administrative claim at this time.

**Automatic Rejection Prior to Conversion**

It has been argued by Debtor and Levon Helm Studios that the Agreement was automatically rejected when not assumed by the Chapter 7 trustee within sixty days of the bankruptcy filing and prior to the conversion of this case to a case under Chapter 11. *See* 11 U.S.C. §365(d)(1).[15] Royalty is correct, however, when it argues that pursuant to § 348(c)[16] a conversion operates to revive the Debtor's right to assume or reject an executory contract, subject to certain exceptions not at issue here.

**Debtor's Business Judgment**

The decision to assume or reject an executory contract is within the sound business judgment of the debtor-in-possession, *see In re Orion Pictures Corp.*, 4 F.3d 1095 (2d Cir. 1993), and in reviewing such a decision the bankruptcy court merely

> "review[s] the trustee's or debtor's decision to adhere to or reject a particular contract in the course of the swift administration of the bankruptcy estate. It is not the time or place for prolonged discovery or a lengthy trial with disputed issues…"

*Id.* at 1099. To meet the business judgment test, the debtor in possession must "establish that rejection will benefit the estate. Once the debtor meets its burden, the non debtor party bears the burden of proving that the debtor's decision derives from bad faith, whim or caprice." *See In re Cent. Jersey Airport Servs., LLC,* 282 B.R. 176, 183 (Bankr. D.

---

[15] "In a case under chapter 7 of this title, if the trustee does not assume or reject an executory contract or unexpired lease of residential real property or of personal property of the debtor within 60 days after the order for relief, or within such additional time as the court, for cause, within such 60- day period, fixes, then such contract or lease is deemed rejected."

[16] 11 U.S.C. § 348(c) states "Sections 342 and 365(d) of this title apply in a case that has been converted under section 706, 1112, 1208, or 1307 of this title, as if the conversion order were the order for relief."

15

N.J. 2002). Debtor has stated that in the exercise of his considered business judgment, the matters delegated to Royalty pursuant to the Agreement are matters within the ordinary competence of an attorney familiar with entertainment law, and can be collected at a far lower cost than provided for in the Agreement. "The business judgment rule requires the Court to determine whether a reasonable business person would make a similar decision under similar circumstances." *See In re Vencor, Inc.*, 2003 WL 21026737 at * 3 (Bankr. D. Del. Apr. 30, 2003); *see also In re Chipwich, Inc.*, 54 B.R. 427, 430-31 (Bankr. S.D.N.Y. 1985) ("It is enough, if, as a matter of business judgment, rejection of the burdensome contract may benefit the estate."). The Court has reviewed the Agreement at issue, and in consideration of its perpetual term, the grant of an exclusive right, and the large commission Royalty is entitled to for royalties collected, determines that a reasonable business person under similar circumstances could decide that rejection would benefit the bankruptcy estate. The burden has therefore shifted to Royalty, to show that Debtor's decision was made in bad faith, or from whim or caprice. In its Opposition, Royalty indicates that Debtor's motion lacks any discussion of the benefit to the estate or the exercise of Debtor's business judgment. The Court thinks this description of Debtor's motion is inaccurate – Debtor indicates that the royalties can be collected for less, and that this consequent savings in collection commissions would provide an economic benefit to the estate. Royalty has failed to overcome Debtor's showing that rejection, in his business judgment, would benefit the bankruptcy estate.

## CONCLUSION

In accordance with the opinion set forth above, the Debtor Mark Levon Helm's Motion to Reject is granted. Debtor's counsel is to submit an order consistent with this opinion.

Dated:  Poughkeepsie, New York
        January 9, 2006

                                           /s/ CECELIA G. MORRIS
                                          Cecelia G. Morris, U.S.B.J.